| | |
|---|---|
| **K.E. and B.E., individually and o/b/o T.E.,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**NORTHERN HIGHLANDS REGIONAL BOARD OF EDUCATION,**<br><br>    **Defendant.** | Civ. No. 18-12617 (KM) (SCM)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiffs K.E. and B.E. ("the parents"), individually and on behalf of their son T.E., sue the Northern Highlands Regional Board of Education (the "school" or the "district"), alleging various federal and state education-law violations. T.E., who was particularly susceptible for medical or psychological reasons, was bullied in middle school to the point of physical injury. Fearing that some of the same abusive middle school students would follow T.E. to public high school, his parents placed him at Dwight-Englewood, an independent college preparatory school, where he remains.

Seeking reimbursement of private school tuition, the parents initiated an administrative proceeding against the elementary school district, Upper Saddle River, and against the regional high school district, Northern Highlands. An administrative law judge ("ALJ") held an evidentiary hearing. The Upper Saddle River (middle school) district settled with the parents for $25,000. As to the Northern Highlands (high school) district, the ALJ denied the parents' due process petition, finding, *inter alia,* that the parents had failed to comply with the necessary notice procedures and had not acted reasonably before unilaterally placing T.E. in a private school. Now in federal court, the parents seek relief for an alleged denial of rights under the Individuals with Disabilities

Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("504"), 29 U.S.C. § 794, New Jersey's Special Education Law, N.J.S.A. § 18A:46-1, and the implementing federal and state regulations. (DE 5).

Before the Court are Plaintiffs' Motion for Summary Judgment and Partial Summary Judgment (DE 24), and Defendant's Motion for Summary Judgment (DE 26). For the reasons that follow, Plaintiffs' motion is **DENIED**, and Defendant's motion is **GRANTED**.

## I.    BACKGROUND[1]

### A. Factual History

#### 1. T.E.'s Adolescence

T.E. was born on May 11, 2002 and attended Cavallini Middle School in Upper Saddle River through eighth grade. (DE 24-1 ¶ 1; DE 26-1 ¶ 1). At Cavallini, T.E. had an individualized education plan ("IEP") for speech therapy because he spoke with a lisp. (DE 24-1 ¶ 2; DE 26-1 ¶ 2). T.E. had never been evaluated to determine his eligibility for special education (DE 24-1 ¶ 3; DE 26-1 ¶ 3), but there was never any apparent need, because between kindergarten and seventh grade, T.E. was an excellent student who played sports and had many friends. (DE 24-1 ¶ 4; DE 26-1 ¶ 4).

In October 2015, when T.E. was in eighth grade, he underwent surgery to remove a brain tumor. (DE 24-1 ¶ 5; DE 26-1 ¶ 5). After he returned to school in January 2016, T.E. was noticeably different. (DE 24-1 ¶ 6; DE 26-1 ¶ 6). His personality and emotional state had changed: he was withdrawn, he cried a lot, could not return to his routines, did not eat, did not sleep, could not do work in school or homework at home, and often said strange things. (DE 24-1 ¶ 7; DE 26-1 ¶ 7).

Within a month after T.E.'s return to middle school, a classmate stole his iPad and math notebook. (DE 24-1 ¶ 8; DE 26-1 ¶ 8). Several weeks later, another student stole, and later returned, his book bag. (DE 24-1 ¶ 9; DE 26-1

---

[1]    "DE __" refers to the docket entry number in this district court case.

¶ 9). At one point, T.E. became upset because of a "friends issue" and decided to eat lunch in the guidance counselor's office. (DE 24-1 ¶ 10; DE 26-1 ¶ 10). During this time, T.E. often complained to his mother and the guidance counselor at Cavallini that his classmates did not like him, that they would make fun of him because of his height, and that he felt isolated. (DE 24-1 ¶ 11; DE 26-1 ¶ 11). On March 16, Dr. Lisa A. Kotler, diagnosed T.E. with "Adjustment Disorder with Mixed Anxiety and Depressed Mood." (DE 24-1 ¶ 12; DE 26-1 ¶ 12).

On May 12, 2016, in anticipation of T.E.'s enrollment in high school that September, his mother, B.E., met with Kelly Peterfriend, the 504 coordinator for Northern Highlands Regional High School. (DE 24-1 ¶ 13; DE 26-1 ¶ 13). During the meeting, Northern Highlands presented a draft 504 Plan to B.E.[2] (DE 24-1 ¶ 14; DE 26-1 ¶ 14). At the time, the 504 team was aware that T.E.

---

[2]  An IEP "is a plan or program developed to ensure that a child who has a disability . . . receives *specialized instruction and related services*." A 504 plan, on the other hand, "is a plan developed to ensure that a child who has a disability . . . receives *accommodations* that will ensure their academic success and *access* to the learning environment." *See What Is the Difference Between an IEP and a 504 Plan?*, Disabilities, Opportunities, Internetworking, and Technology, U. OF WASHINGTON (Apr. 30, 2019), https://www.washington.edu/doit/what-difference-between-iep-and-504-plan.

There are subtle but important differences between the two:

Not all students who have disabilities require specialized instruction. For students with disabilities who do require specialized instruction, the Individuals with Disabilities Education Act (IDEA) controls the procedural requirements, and an IEP is developed. The IDEA process is more involved than that of Section 504 of the Rehabilitation Act and requires documentation of measurable growth. For students with disabilities who do not require specialized instruction but need the assurance that they will receive equal access to public education and services, a document is created to outline their specific accessibility requirements. Students with 504 Plans do not require specialized instruction, but, like the IEP, a 504 Plan should be updated annually to ensure that the student is receiving the most effective accommodations for his/her specific circumstances.

(*Id.*).

had been diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood, and the 504 Plan specifically cited Dr. Kotler's March 16 letter. (DE 24-1 ¶ 15; DE 26-1 ¶ 15).

### 2. Bullying Incidents

In May and June 2016, the severity of the bullying increased. (DE 24-1 ¶ 17; DE 26-1 ¶ 17). On May 16, a student picked up T.E. during recess and dropped him, causing T.E. to hit his head on the pavement, which triggered a grand mal seizure. (Id.). A nurse eventually arrived, and T.E. continued to seize for approximately one to two minutes after anti-seizure medication was administered. (DE 24-1 ¶ 18 & 19; DE 26-1 ¶ 18 & 19).

On June 8, one of T.E.'s classmates held a pencil upright on his chair as he sat down. (DE 24-1 ¶ 21; DE 26-1 ¶ 21). The pencil punctured T.E.'s pants and underwear and pierced his anus, causing rectal bleeding. (DE 24-1 ¶ 22; DE 26-1 ¶ 22). When B.E. arrived at Cavallini, she found T.E. in the bathroom of the nurse's office, distraught. (DE 24-1 ¶ 23; DE 26-1 ¶ 23). She had to insert tissues into his anus to control the bleeding. (DE 24-1 ¶ 24; DE 26-1 ¶ 24).

### 3. Immediate Aftermath and the 504 Plan

Following the pencil incident, Cavallini provided T.E. with one-on-one supervision. (DE 24-1 ¶ 24; DE 26-1 ¶ 24). On June 9, 2016 James McCusker, the principal of Cavallini, spoke with B.E. and emailed her that evening, noting "I continue to be moved by [T.E.'s] recent experiences and appreciate your justified perspective." (DE 24-1 ¶ 25; DE 26-1 ¶ 25). McCusker memorialized the discussion that had occurred with B.E. earlier that day to "ensure that we share a common understanding of how the school plans to manage [T.E.'s] safety and well-being." (DE 24-1 ¶ 26; DE 26-1 ¶ 26). He noted that that "[i]t was agreed that, for the remainder to the school year, there will be 1:1 adult supervision for [T.E.] in all settings (i.e., classroom, recess, hallway transition).

This level of supervision will be in place throughout the regular school day."[3] (DE 24-1 ¶ 27; DE 26-1 ¶ 27). McCusker then advised B.E. that that they should "get together for a meeting as soon as possible." (DE 24-1 ¶ 28; DE 26-1 ¶ 28).

Fearful for T.E.'s safety, his parents met with Cavallini staff on June 10, to develop an "action plan" to keep him safe and to discuss exploring private- and public-school options for high school. (DE 24-1 ¶ 29; DE 26-1 ¶ 29). B.E. testified that the purpose of the meeting was to discuss how Cavallini would keep T.E. safe and what options were available to them because she and her husband were "gravely concerned" for T.E.'s safety in connection with his transition to Northern Highlands with the same children who had bullied him. (DE 24-1 ¶ 30; DE 26-1 ¶ 30).

At the meeting, McCusker volunteered to contact Joseph Occhino, the principal at Northern Highlands, to set up a meeting concerning T.E.'s transition to high school. (DE 24-1 ¶ 31; DE 26-1 ¶ 31). T.E.'s parents wanted to meet with Occhino because they believed that "speaking to Mr. Occhino will be important as having top down support is essential." (DE 24-1 ¶ 32; DE 26-1 ¶ 32). B.E. later testified that McCusker suggested that Occhino be involved in light of the uniqueness of T.E.'s situation. (*Id.*). McCusker also agreed to consult with the child study team ("CST") at Cavallini to investigate potential private school placements for T.E. (DE 24-1 ¶ 33; DE 26-1 ¶ 33).

On June 12, B.E. provided Northern Highlands with comments to the May 12 504 Plan. (DE 24-1 ¶ 36; DE 26-1 ¶ 36). T.E.'s parents both signed the 504 Plan, (DE 26-2 ¶ 5 & 6; DE 29-1 ¶ 5 & 6), but when B.E. provided her comments, she specifically did not check (*i.e.*, signal assent to) the line that stated "I agree with the Section 504 Plan as written." (DE 26-2 ¶ 6; DE 29-1 ¶ 6). B.E. handwrote "adding in my comments" and initialed the end of the

---

[3]    Despite this, another classmate tackled T.E. during a field day later in June. (DE 24-1 ¶ 28; DE 26-1 ¶ 28).

line.[4] (*Id.*). B.E. later testified that she did not agree to implementation of the draft 504 Plan and that she had planned on meeting with Northern Highlands later in June to discuss her concerns for T.E.'s safety following, among other things, the pencil incident. (DE 24-1 ¶ 39; DE 26-1 ¶ 39).

Thereafter, T.E.'s parents, with McCusker's assistance, worked "parallel paths" to place T.E. in September either at Northern Highlands or in a private school. (DE 24-1 ¶ 44; DE 26-1 ¶ 44). McCusker investigated Dwight-Englewood School as an option. (DE 24-1 ¶ 45; DE 26-1 ¶ 45). Dwight-Englewood School is a private college preparatory school in Englewood. It has not been approved by the State of New Jersey pursuant to N.J.A.C. 6A:14-7.2 as a private school for students with disabilities. (DE 29-1 ¶ 42).[5]

On June 16, 2016, McCusker informed the parents that Dwight-Englewood had told him that there was "no pathway for September 2016 admittance" for T.E. (*Id.*). Later that day, McCusker offered to contact Montclair Kimberley Academy "about immediate options." (DE 24-1 ¶ 46; DE 26-1 ¶ 46). After he contacted Montclair Kimberley Academy, McCusker told the parents

---

[4]    Those comments are:

    12. pair him with patient and nurturing teachers who will encourage him to go to extra help, give extra credit and maybe not so heavy with homework

    13. assign him some classes and lunch with some friends

    14. have the noncontact sports teachers[—]golf, tennis[—]reach out to him

    15 meet with his teaches before the school year starts as well as monthly + discuss updates and progress concerns

    16. specific attention and consideration to which guidance counselor he will be assigned to and an early introduction to that person

(DE 23-21 at 2–3).

[5]    T.E.'s parents nevertheless maintain that Dwight-Englewood was an appropriate placement for T.E. (*Id.*). They note that Dwight-Englewood made accommodations for T.E. and provided a learning specialist. (*Id.*). *See infra.*

that he had "reached a dead end with them as well," because by June, private schools had completed their admission process for September. (*Id.*).

### 4. The June 28 Meeting

On June 28, 2016 T.E.'s parents again met with McCusker and representatives of Northern Highlands to discuss T.E.'s future at Northern Highlands. (DE 24-1 ¶ 47; DE 26-1 ¶ 47). Peterfriend and a guidance counselor attended the meeting on behalf of Northern Highlands. (*Id.*). During the meeting, the parties discussed the bullying to which T.E. had been subjected at Cavallini. (DE 24-1 ¶ 48; DE 26-1 ¶ 48). B.E. later testified that she and her husband were "extremely scared and worried" about T.E.'s safety and that they were looking for Northern Highlands to tell them how they planned to ensure T.E.'s safety. (DE 24-1 ¶ 48; DE 26-1 ¶ 48).

Occhino, the Northern Highlands principal, did not attend the June 28 meeting. (DE 24-1 ¶ 49; DE 26-1 ¶ 49). T.E.'s parents were told that he wasn't available. (*Id.*). During the meeting, the Northern Highlands 504 team told the parents that they could not provide one-to-one adult supervision for T.E. (DE 24-1 ¶ 50; DE 26-1 ¶ 50). The district indicated that it could not afford a full-time bodyguard, but the team instead recommended that T.E. leave each class five minutes early to avoid problems in the hallway and to allow him to enter the lunchroom before the other students arrived. (*Id.*). It was mentioned that the lunchroom and hallways could be "very chaotic." (*Id.*). T.E.'s parents found this plan unacceptable, because the bullying incidents that occurred at Cavallini occurred in class and at recess—not in a lunchroom or hallway. (DE 24-1 ¶ 52; DE 26-1 ¶ 52). B.E. testified that a plan that had T.E. leave each class five minutes early would have further stigmatized him and was tantamount to punishing T.E.—the victim of the bullying. (*Id.*). Tracy LaRocca, the school's learning disability teacher consultants, explained that if crowded

hallways were a concern, the school would be able to accommodate it. [6] (DE 26-2 ¶ 18; DE 29-1 ¶ 18).

During the meeting, T.E.'s parents also requested that Northern Highlands evaluate T.E. for eligibility for special education. (DE 24-1 ¶ 57; DE 26-1 ¶ 57). They wanted T.E. evaluated as soon as possible, because at this point, they had not yet identified a school at which they believed he would be safe. (*Id.*).

After the meeting, Northern Highlands proposed and sent a revised 504 Plan to T.E.'s parents that suggested that T.E. leave class five minutes early as an additional "action strategy." (DE 24-1 ¶ 53; DE 26-1 ¶ 53). The revised plan did not provide the one-to-one protection that Cavallini had provided to T.E. after the pencil incident. (*Id.*). T.E.'s parents did not agree with this 504 Plan either, because it would have required him to miss approximately 10% of his instructional time by having him leave each class five minutes early. (DE 24-1 ¶ 55; DE 26-1 ¶ 55). This plan was not signed.

B.E. testified that they had always intended to send T.E. to public school with his friends. (DE 24-1 ¶ 58; DE 26-1 ¶ 58). Because their preference was for T.E. to attend Northern Highlands, B.E. arranged for T.E. to meet the school nurse on July 7. (DE 24-1 ¶ 59; DE 26-1 ¶ 59). At the same time, T.E.'s parents pursued potential private-school placement options for T.E. (DE 24-1 ¶ 60; DE 26-1 ¶ 60). Indeed, after McCusker informed them on June 16 that there was no pathway to admission at Dwight-Englewood, his father K.E. called Dwight-Englewood directly, which agreed to meet with the them. (*Id.*).

As of July 7, T.E.'s parents were pursuing placements at Northern Highlands or Dwight-Englewood, which were in their eyes the only options

---

[6]    LaRocca is also a part-time teacher in the Northern Highlands Regional High School District. (DE 26-2 ¶ 1; DE 29-1 ¶ 1). She is a member of Northern Highlands' CST—but had not been a member of T.E.'s 504 committee. (DE 24-1 ¶ 42; DE 26-1 ¶ 42; DE 26-2 ¶ 2; DE 29-1 ¶ 2). LaRocca first learned about T.E.'s case around June 30. (DE 26-2 ¶ 3; DE 29-1 ¶ 3). She later testified on behalf of Northern Highlands at the hearing; she was district's only witness. (DE 24-1 ¶ 42; DE 26-1 ¶ 42).

available to T.E. that September. (DE 24-1 ¶ 63; DE 26-1 ¶ 63). On July 8, B.E. emailed to Peterfriend to tell her that the Dwight-Englewood psychologist wanted to speak to her and—to help Dwight-Englewood determine the level of support that T.E. would need—to review the 504 Plan that Northern Highlands had proposed. (DE 24-1 ¶ 61; DE 26-1 ¶ 61).

### 5. T.E.'s Parents Enroll Him at Dwight-Englewood

On July 15, 2016 Dwight-Englewood sent T.E.'s parents an enrollment contract, providing them twenty-four hours to sign. (DE 24-1 ¶ 65; DE 26-1 ¶ 65). The enrollment contract obligated the parents to pay a full year's tuition of $42,000. (DE 24-1 ¶ 88; DE 26-1 ¶ 88). K.E. and B.E. both signed. (DE 24-1 ¶ 65; DE 26-1 ¶ 65). From their perspective, they signed the Dwight-Englewood contract because they had yet to secure a safe option for T.E. for the following September. ((DE 24-1 ¶ 66; DE 26-1 ¶ 66). They both testified that notwithstanding the contract, they still wanted to send T.E. to Northern Highlands. (DE 24-1 ¶ 67; DE 26-1 ¶ 67).

At some point thereafter, Dwight-Englewood assured K.E. and B.E. that T.E. would be safe if he attended school there. (DE 24-1 ¶ 64; DE 26-1 ¶ 64). It assured them that an adult would supervise and monitor T.E., that if a student assaulted T.E. he or she would be expelled, and that all Dwight-Englewood personnel, including teachers, the athletic department, and the coaching staff, would be aware of a seizure protocol for T.E. and would carry his emergency spray. (*Id.*)

### 6. The July 20 Meeting

On July 20, 2016 B.E. attended an evaluation-planning meeting with the CST from Northern Highlands. (DE 24-1 ¶ 68; DE 26-1 ¶ 68). B.E. advised Northern Highlands that she and her husband were investigating private-school placements for T.E. (DE 24-1 ¶ 61; DE 26-1 ¶ 61). B.E. testified that few options were available to them, because the application process for September matriculation had been completed at private schools. (*Id.*).

LaRocca, as T.E.'s case manager, also attended.[7] (DE 24-1 ¶ 61; DE 26-1 ¶ 61). She testified that during the evaluation-planning meeting, B.E. and the CST discussed the need to perform further testing on T.E. to understand his cognitive functioning after his brain surgery, and it was later determined that T.E. should receive a neuropsychological evaluation.[8] (DE 24-1 ¶ 70 & 71; DE 26-1 ¶ 70 & 71). The evaluation-meeting attendees agreed that Dr. Jane Healey would perform the evaluation. (DE 24-1 ¶ 72; DE 26-1 ¶ 72).

B.E. also raised concerns regarding several individual students, and LaRocca explained to her that T.E. would have minimal contact with those students due to the schedule for T.E. that the school intended to fashion.[9] (DE 26-2 ¶ 19; DE 29-1 ¶ 19). B.E. told the others that she had looked into other potential schools for T.E. and that Dwight-Englewood was one of those schools. (DE 26-2 ¶ 21; DE 29-1 ¶ 21. However, she did not reveal that the family had already contracted for T.E. to attend Dwight-Englewood in September. (*Id.*).

B.E. also did not explain during the meeting why she thought the 504 Plan she had signed on June 12 was inadequate for T.E. (DE 26-2 ¶ 15; DE 29-1 ¶ 15). In fact, there was no discussion about the executed 504 Plan at the

---

[7]     LaRocca had first learned of T.E. around June 30, after Tom Buono, Northern Highlands's Director of Special Services, received B.E.'s request that T.E. be evaluated for eligibility for special education. (DE 24-1 ¶ 69; DE 26-1 ¶ 69). Buono then contacted LaRocca, telling her "[w]e have a new referral" and directing her to schedule a meeting with the T.E.'s parents. (*Id.*). Buono also briefly advised LaRocca that T.E. had a 504 plan and that his parents wanted to have T.E. evaluated for eligibility for special education. (*Id.*).

[8]     When there is a concern that a child may have cognitive issues, Northern Highlands's school psychologist typically performs a Wechsler Intelligence Test, while LaRocca performs the Woodcock-Johnson Test of Achievement as part of an educational evaluation. (DE 24-1 ¶ 71; DE 26-1 ¶ 71). In T.E.'s case, LaRocca testified that all the participants at the evaluation-planning meeting believed a full neuropsychological evaluation would be more appropriate and that a neuropsychological evaluation would have encompassed everything that Northern Highlands would have done if its personnel had evaluated T.E. (*Id.*).

[9]     LaRocca did yet not know that the family had contracted to pay for T.E. to attend Dwight-Englewood in September. (DE 26-2 ¶ 20; DE 29-1 ¶ 20).

July 20 meeting. (*Id.*). B.E. simply informed the CST that T.E. had been bullied when he attended Cavallini and that Cavallini had assigned a one-on-one aide to T.E. to ensure his safety. (DE 24-1 ¶ 73; DE 26-1 ¶ 73). Apart from the neuropsychological evaluation, Northern Highlands did not request any other assessments of T.E. (DE 24-1 ¶ 72; DE 26-1 ¶ 72). After the meeting, B.E. and LaRocca scheduled the evaluation. (*Id.*).

### 7. Awaiting the Neuropsychological Evaluation Results

After the evaluation-planning meeting, LaRocca informed Tom Buono, Northern Highlands's Director of Special Services, that B.E. was concerned for T.E.'s safety because he had been bullied while he attended Cavallini. (DE 24-1 ¶ 76; DE 26-1 ¶ 76). LaRocca, however, did not specifically inform Buono about the pencil incident or tell Buono that Cavallini had assigned a one-on-one aide to T.E. to ensure his safety. (DE 24-1 ¶ 77; DE 26-1 ¶ 77).

On July 21, 2016 the day after the evaluation-planning meeting, K.E. called Buono to discuss his concerns for T.E.'s safety. (DE 24-1 ¶ 78; DE 26-1 ¶ 78). He did not reach Buono that day (*id.*), but when they finally spoke, K.E. told Buono of the bullying incidents that had occurred at Cavallini and that McCusker had assigned T.E. a full-time bodyguard for his safety, (DE 24-1 ¶ 79; DE 26-1 ¶ 79). Buono asked why T.E. had not been classified if he had the type of safety needs then being requested. (*Id.*). On August 8, K.E. emailed McCusker to find out why T.E. had not been classified at Cavallini based on his safety needs. (DE 24-1 ¶ 80; DE 26-1 ¶ 80).

McCusker explained that T.E. had received a "speech only" IEP, that a 504 Plan had been issued because of T.E.'s anxiety and depression diagnoses, and that Cavallini had decided to assign dedicated supervision to T.E. for physical protection because of "some unpredictable and extraordinary incidents" that had occurred:

> While it is difficult to know the full context of the questions, I can offer the following:
>
> [T.E.] has been a "classified student," designated as "speech only." This means, at some point, he was diagnosed with a disability

qualifying him exclusively for services related to speech. While at Cavallini, he did not go through a full child study team evaluation. Therefore, he was not deemed as *"not eligible"*, rather he was not fully evaluated for determination. If I understand correctly, I believe he was being fully evaluated by the NHRHS Child Study Team this summer.

The second question is in regards to classification at Cavallini due to safety needs. [T.E.] gained a 504 Plan (*not considered SE classification*) to address the diagnosis of anxiety and depression. This was the extent of the official diagnosis and response.

As we know, the conclusion of last year featured some unpredictable and extraordinary incidents. As a result with an abbreviated amount of time remaining in the school year (*approximately two weeks*), we decided, without classification, to assign dedicate[d] supervision to [T.E.]. Throughout his time, he was medically cleared for participation in PE and recess; and we did not have a medical diagnosis indicating a condition that would official qualify him for a classification based on the need for physical protection.

(DE 24-1 ¶ 81; DE 26-1 ¶ 81). On August 11, K.E. forwarded McCusker's clarifying response to Buono. (DE 24-1 ¶ 82; DE 26-1 ¶ 82). K.E. summarized the bullying incidents to which T.E. had been subjected, and he alerted Buono that "[t]he stress caused by the trauma in school contributed to [T.E.'s] post-surgical diagnosis of post-traumatic stress disorder." (*Id.*). K.E. again informed Buono that Cavallini had assigned T.E. a full-time bodyguard "to simply keep him safe." (DE 24-1 ¶ 83; DE 26-1 ¶ 83). K.E. also commented on the 504 Plan that Northern Highlands had issued in June:

In putting together [T.E.'s] 504 for next year, we have had many meetings with NHRHS to establish a plan to keep him safe. The NHRHS staff indicated that they could not afford a full time body guard. As a result, the team recommended that he leave classes 5 minutes early to avoid problems in the hallway as well as be able to go into the lunchroom before everyone arrives because it was mentioned that lunch and hallways can be "very chaotic." What this results in is [T.E.] intentionally missing more than 10% of the academic year. While the neuropsychological testing will be helpful to determine his learning needs, the results do not address his

safety requirements. This is clearly a very unusual situation . . .
[T.E.] deserves an academically challenging AND safe environment.

(DE 24-1 ¶ 84; DE 26-1 ¶ 84) (alterations in original).

At this point (August 11), K.E. and B.E. still considered Northern Highlands a potential placement option for T.E. (DE 24-1 ¶ 85 & 86; DE 26-1 ¶ 85 & 86). B.E. wanted to send T.E. to Northern Highlands in September because his friends would be attending, and she and K.E. believed that changing schools would have been difficult for T.E. (DE 24-1 ¶ 87; DE 26-1 ¶ 87). K.E. similarly testified that in August he still wanted to send T.E. to Northern Highlands because "[t]hat's where his friends were" and "[w]e knew it would be traumatic if he had to go anywhere else." (DE 24-1 ¶ 88; DE 26-1 ¶ 88). K.E. further testified that T.E. "had already been through enough. We didn't need to now transition him to a new school. That would have just been another trauma." (*Id.*). Even though the enrollment contract with Dwight-Englewood obligated them to pay a full year's tuition, K.E. and B.E. both testified that as of August that they were willing to lose $42,000 and still enroll T.E. at Northern Highlands. (DE 24-1 ¶ 88; DE 26-1 ¶ 88).

### 8. T.E. Begins at Dwight-Englewood

In September 2016, T.E. began to attend school at Dwight-Englewood. (DE 24-1 ¶ 90; DE 26-1 ¶ 90). There, he did not have an IEP. (DE 26-2 ¶ 76; DE 29-1 ¶ 76). On September 6, K.E. informed Buono that "[a]s we have indicated, in light of the experiences [T.E.] had at Cavallini, coupled with the 504 Plan set in place by NHRHS, for safety reasons [T.E.] is continuing his education at Dwight-Englewood" and that "[w]e would like to meet as soon as practical to discuss the necessary reimbursements from the district." (DE 24-1 ¶ 91; DE 26-1 ¶ 91). K.E. concluded that "this was never our intention but we made this decision with [T.E.'s] safety as our highest priority." (*Id.*). Buono told K.E. that "once you send us the results of the neuropsych evaluation we will schedule a meeting with you." (DE 24-1 ¶ 92; DE 26-1 ¶ 92). However, K.E. had previously alerted Buono that the results of the evaluation would not have addressed T.E.'s safety needs. (*Id.*). Between July 1 and September 6 (the first

day of school), T.E.'s parents had never requested of Northern Highlands any services or modification of T.E.'s 504 Plan.[10] (DE 26-2 ¶ 24; DE 29-1 ¶ 24).

Later in September, Buono informed the CST that T.E. had been enrolled at Dwight-Englewood and would not be attending Northern Highlands. (DE 24-1 ¶ 93; DE 26-1 ¶ 93). LaRocca testified that from the perspective of the CST, T.E.'s enrollment at Dwight-Englewood did not alter the team's intent with respect to T.E. (Id.).

In October 2016, Dr. Healey issued a written report of the neuropsychological evaluation of T.E.[11] (DE 24-1 ¶ 94; DE 26-1 ¶ 94). Dr. Healey reported that in January and February 2016, T.E. "was noted to have difficulty returning to school, which occurred 6 weeks after surgery, he was irritable and sad, very fearful of any medical procedures, and he talked about 'killing himself' but he had not actively tried to harm himself nor did he have any plan to do so." (DE 24-1 ¶ 95; DE 26-1 ¶ 95). Based on her findings, Dr. Healey reported that T.E. had been "rated by his mother to fall above the 90th percentile [f]or internalizing and externalizing problems, with ratings above the 97th percentile noted for anxiety, depression, withdrawal, social problems, and aggression." (Id.). Dr. Healey further reported that T.E. exhibited "catastrophic reactions" when presented with challenges, without exhibiting any prior signs of frustration. (DE 24-1 ¶ 96; DE 26-1 ¶ 96). She diagnosed him with "Traumatic Brain Injury (s/p Tumor Resection), seizure activity, possible effects of antiepileptic medications"; "ADHD-Inattentive Type"; "Learning Disorder NOS (Initiation, retrieval, visual organization, Executive functioning)"; "Anxiety Disorder, NOS"; "Depressive Disorder, NOS"; and "Coordination Disorder." (DE 24-1 ¶ 97; DE 26-1 ¶ 97).

---

[10]    Indeed, the parents made no such requests of the district after June 12 (the day B.E. signed the 504 plan) and November 9 (the day T.E.'s parents for the first time requested in writing tuition reimbursement for T.E.'s placement).

[11]    Dr. Healey had performed neuropsychological testing of T.E. on July 29, August 11, August 16, and August 26. (DE 24-1 ¶ 94; DE 26-1 ¶ 94).

On October 11, 2016, T.E.'s parents forwarded to Northern Highlands Dr. Healey's written report. (DE 24-1 ¶ 98; DE 26-1 ¶ 98). The next day. LaRocca invited T.E.'s parents to an eligibility meeting. (DE 26-2 ¶ 26; DE 29-1 ¶ 26).

### 9. The October 13 Meeting

On October 13, 2016 T.E.'s parents met with seven representatives of Northern Highlands, who reported that T.E. was eligible for special education and related services. (DE 24-1 ¶ 99; DE 26-1 ¶ 99). T.E.'s parents made it clear that T.E. would continue to attend Dwight-Englewood and that they did not wish to remove him from this educational setting. (DE 26-2 ¶ 28; DE 29-1 ¶ 28). Thus T.E.'s parents declined placement at Northern Highlands even before they received the school's draft IEP for review. (DE 26-2 ¶ 29; DE 29-1 ¶ 29).

It was at this meeting that Northern Highlands for the first time presented the parents with a sixteen-page draft IEP. (DE 24-1 ¶ 99; DE 26-1 ¶ 99). LaRocca later testified that the parents had never had an opportunity to review the draft IEP prior to the meeting and that they wanted to review the IEP with their attorney. (DE 24-1 ¶ 100; DE 26-1 ¶ 100). The draft IEP contained the following note: "[The parents] would like [T.E.] to continue at Dwight-Englewood. The CST feels [T.E.] can be educated at Northern Highlands." LaRocca testified that, prior to the meeting, Northern Highlands knew that the parents wanted T.E. to attend Dwight-Englewood only because they feared for his safety. (DE 24-1 ¶ 101; DE 26-1 ¶ 101). The meeting lasted less than an hour and afterward LaRocca had no further interactions with T.E.'s parents. (DE 24-1 ¶ 102; DE 26-1 ¶ 102).

### 10.    The Final IEP

On November 1, 2016 Northern Highlands sent the parents the final IEP. (DE 24-1 ¶ 103; DE 26-1 ¶ 103). The IEP did not specifically detail the bullying incidents that had occurred at Cavallini, but stated generally that T.E.'s parents were "concerned with how [T.E.] had been treated at school and some of the modifications that needed to be put into place to ensure [T.E.'s] well

15

being." (DE 24-1 ¶ 104; DE 26-1 ¶ 104). The IEP proposed that T.E. could leave class five minutes early. (*Id.*). Prior to issuing the November 1 IEP, no member of the Northern Highlands CST had personally evaluated T.E., and Dr. Healey was the only person who had evaluated T.E. after the July 20 meeting between B.E. and Northern Highlands. (DE 24-1 ¶ 105 & 106; DE 26-1 ¶ 105 & 106). The final IEP did not explicitly refer to Dr. Healey's neuropsychological report or the tests she had run. (DE 24-1 ¶ 107; DE 26-1 ¶ 107).[12]

In its October 11 initial eligibility letter Northern Highlands had explained that the reason for its rejection of the parents' request that T.E. be educated at Dwight-Englewood was because "Least Restrictive Environment (LRE) is the requirement in federal law that students with disabilities receive their education, to the maximum extent appropriate, with nondisabled peers and that special education are not removed from regular classes unless, even with supplemental aides and services, education in regular classes cannot be achieved satisfactorily."[13] (DE 24-1 ¶ 117; DE 26-1 ¶ 117).

---

[12]     Dr. Healey's report contained twenty-two recommendations that spanned more than three pages. (DE 24-1 ¶ 114; DE 26-1 ¶ 114). The majority of those recommendations were not included in the final IEP. (*Id.*). Among other things, Dr. Healey recommended that T.E. be provided with "a learning specialist individually to work with him on basic organization and executive function skills"; "preferential seating of the left side of the classroom"; and "largely spaced graph paper to help him organize math problems." (DE 24-1 ¶ 115; DE 26-1 ¶ 115). Dr. Healey also recommended that T.E. "should be informed of examinations at least two weeks in advance"; that "the learning specialist should break down studying into parts and help him to prepare for tests as well as explicitly teaching him strategies to prepare for tests"; and that "[h]is energy level should be monitored frequently" because T.E. "evidenced signs of cognitive fatigue." (*Id.*). These recommendations were not incorporated into IEP. (*Id.*).

Dr. Healey's report also noted that "[T.E.] becomes easily overwhelmed and requires a smaller and structured school environment. (*Id.*). Because of physical and emotional safety reasons, a large public high school will not provide [T.E.] with the level of support he requires." (DE 24-1 ¶ 116; DE 26-1 ¶ 116). However, Northern Highlands disagreed with this recommendation, arguing that "[t]he Northern Highlands Child Study Team feels [T.E.] can be educated at Northern Highlands." (*Id.*).

[13]     Northern Highlands did not provide the reasons it used as a basis for disagreeing the request that T.E. be educated at Dwight-Englewood. (DE 24-1 ¶ 118;

On November 9, T.E.'s parents rejected the IEP, because they thought it was not appropriate for T.E. (DE 24-1 ¶ 122; DE 26-1 ¶ 122). Instead, they requested that "the district agree to continue [T.E.'s] placement at Dwight-Englewood School." (*Id.*). This letter—written and sent four months after T.E.'s parents contracted with Dwight-Englewood and two months after T.E. began attending classes there—was the first occasion on which T.E.'s parents requested in writing reimbursement for the costs of the Dwight-Englewood placement. (DE 26-2 ¶ 31; DE 29-1 ¶ 31). Northern Highlands rejected the parents' request. (DE 24-1 ¶ 122; DE 26-1 ¶ 122).

Northern Highlands and Upper Saddle River had not provided T.E.'s parents with a PRISE booklet before T.E.'s enrollment at Dwight-Englewood on September 6.[14] (DE 24-1 ¶ 123; DE 26-1 ¶ 123). Northern Highlands did not provide them a PRISE booklet until the IEP meeting on October 13. (*Id.*).

---

DE 26-1 ¶ 118). Nor did it do so in the final IEP. (DE 24-1 ¶ 119; DE 26-1 ¶ 119). Northern Highlands also did not explain the bases for its disagreement with Dr. Healey's opinion that "a large public high school cannot provide [T.E.] with the level of support he requires." (DE 24-1 ¶ 120; DE 26-1 ¶ 120). Nor did it do so in the final IEP. (DE 24-1 ¶ 121; DE 26-1 ¶ 121).

[14]     "PRISE" stands for Parental Rights in Special Education. The booklet is published by the New Jersey Department of Education "describe[s] the state and federal laws affecting the provision of special education." It provides that

> [Parents] must be given a copy of this booklet one time per year and whenever:
>
> > A parent requests a copy;
> >
> > [A] child is referred for an initial evaluation;
> >
> > The first request for a due process hearing or first request for a complaint is submitted to the Department of Education in a school year; and
> >
> > The decision to take a disciplinary action is made that constitutes a change of placement.

N.J. Dep't of Education, Parental Rights in Special Education 3 (rev'd Aug. 2016), https://www.state.nj.us/education/specialed/form/prise/prise.pdf

## B. Procedural History

On May 5, 2017, T.E.'s parents filed a petition for due process with the Office of Special Education Programs. (DE 23-1). On September 21, 2017, Northern Highlands filed a motion to dismiss the petition. (DE 23-2). On November 29, 2017, ALJ Thomas Betancourt denied the motion but ruled that "petitioners did not provide proper notice pursuant to N.J.A.C. 6A:14-2.10(c) or 20 U.S.C. § 1412(a)(10)(C)(iii)." (DE 23-6 at 5).

On December 11, Northern Highlands moved to bifurcate the due process hearing. (DE 23-7 at 2 ¶ 3). On January 12, 2018, the ALJ granted the motion and:

> ORDERED that the hearing . . . shall be limited to the following:
>
> a. What, if any, effect shall Petitioners' failure to provide adequate notice pursuant to N.J.A.C. 6A:14-2.10(c) and 20 U.S.C.A. § 1412(a)(10)(C)(iii) have on their request for reimbursement of tuition and other costs for the unilateral placement of T.E.;
>
> b. Whether Petitioners' Section 504 claims are subsumed by their IDEA claims against NHRHS; and[]
>
> c. Whether Petitioners are entitled to compensatory education.

(DE 23-7 at 4).

The ALJ held hearings limited to these issues on February 9 and February 14. (DE 23-35 & DE 23-36). On June 27, he issued a final decision, dismissing the due process petition:

> The answer to those questions need not be addressed as I have determined factually that both the Section 504 Accommodation Plan signed by B.E. on June 12, 2016, and the IEP offered by NHRHS at the October 13, 2016 offered FAPE. As FAPE was offered and rejected by Petitioners, their requests for relief set forth in the due process petition must be denied.

(DE 23-8 at 17).

## C. The ALJ's Findings

### 1. Factual Findings

1. The ALJ found that two events took place at Cavallini in June 2016 with the first event occurring when "another student placed a pencil pointing up under T.E. while he was about to be seated in his chair. This caused injury to T.E." and "[t]he second event was [that] T.E. tackled to the ground by another student and suffered a grand mal seizure." On May 16, T.E. suffered a grand mal seizure after being picked up in the air and dropped on the ground causing him to strike his head. (DE 24-1 ¶ 124). The parents allege that the pencil incident occurred on June 8, 2016. Following the pencil incident, Cavallini assigned a dedicated aide to T.E. for his protection and he was subsequently tackled during a field day as a "joke" notwithstanding the assignment of the aide. (*Id.*).

2. The ALJ found that "[a] proposed 504 Accommodation Plan was sent to Petitioners in June 2016." (DE 24-1 ¶ 125).
The parents allege that *two* 504 Plans were sent to them. Northern Highlands issued the first 504 Plan on May 12 when B.E. met with Peterfriend. Northern Highlands sent a second 504 Plan to the Parents after June 12. (*Id.*).

3. The ALJ found that B.E. signed the 504 Plan on June 12 and inserted written comments. (DE 24-1 ¶ 126).
The parents allege that on June 12, B.E. signed the 504 Plan that Northern Highlands had issued on May 12 and that B.E. never signed the version of the 504 Plan that was issued after June 12. (*Id.*)

4. The ALJ found that "[w]hen signed by B.E., notwithstanding the handwritten comments and the failure to check the 'I agree' box, this 504 Plan was accepted by Petitioners and was the operative 504 Plan at that time." (DE 24-1 ¶ 127).
The parents allege that over the course of a month, B.E. commented on the 504 Plan that had been issued on May 12. The parents allege that when B.E. signed the 504 Plan on June 12, she added the phrase

"adding in my comments" at the end of the sentence "I agree with the Section 504 Plan as written." B.E. did not check the blank next to the sentence "I agree with the Section 504 Plan as written." After B.E. signed the 504 Plan, Northern Highlands issued a new 504 Plan. B.E. never agreed to the implementation of this 504 Plan. The parents allege that Northern Highlands's second 504 Plan did not incorporate the vast majority of B.E.'s handwritten comments. Instead, the second 504 Plan proposed that T.E. leave class five minutes early as an additional "action strategy." This 504 Plan did not provide the 1:1 protection that Cavallini had provided to T.E. after the pencil incident. (*Id.*).

5. The ALJ found that K.E. did not attend the June 28 meeting with Northern Highlands. (DE 24-1 ¶ 128).
   The parents allege that K.E. and B.E. both attended the meeting. (*Id.*).

6. The ALJ found that K.E. attended the evaluation-planning meeting that occurred on July 20. (DE 24-1 ¶ 129).
   The parents allege that K.E. did not attend this meeting. (*Id.*).

7. The ALJ found that "[t]he 504 Accommodation Plan signed by B.E. on June 12, offered FAPE to T.E. as it addressed his needs and provided adequate accommodations." (DE 24-1 ¶ 130).
   The parents allege that T.E.'s needs are discussed at length in Dr. Healey's report of her neuropsychological examination of T.E. and that a comparison of Dr. Healey's report and the 504 Plan executed by B.E. reveals that the first 504 Plan offered by Northern Highlands did not address T.E.'s needs. The parents further allege that the second 504 Plan did not offer a FAPE because it violated 34 C.F.R. § 104.33(b)(1) by proposing that T.E. leave class five minutes early as an additional "action strategy." (*Id.*).

8. The ALJ found that "[t]he IEP proposed at the October 13, 2016 [meeting], offered FAPE to T.E. It properly identified classification category as Traumatic Brain Injury and offered special education and related services to address his needs." (DE 24-1 ¶ 131).

The parents allege that T.E.'s needs are discussed at length in Dr. Healey's report of her neuropsychological examination of T.E. and that a comparison of Dr. Healey's report and the IEP issued by Northern Highlands reveals that the IEP did not address T.E.'s needs. (*Id.*).

### 2. Credibility Determinations

1. The ALJ determined that K.E. was "disingenuous in much of testimony" and that "[h]e spun his answers to conform to his theme, which was NHRHS did not offer sufficient assurances that T.E. would be safe." The ALJ also disbelieved K.E.'s testimony that "he was willing to lose the entire tuition if only NHRHS could assure him of T.E.'s safety." (DE 24-1 ¶ 132).

   The parents allege that this is false. (*Id.*).

2. The ALJ determined that K.E.'s testimony that "NHRHS did not offer sufficient assurances that T.E. would be safe" was not credible. (DE 24-1 ¶ 133).

   The parents argue this is inconsistent with nontestimonial extrinsic evidence. They note that on March 16, Dr. Kotler diagnosed T.E. with "Adjustment Disorder with Mixed Anxiety and Depressed Mood"; that Dr. Healey evaluated T.E. on July 29, August 11, August 16, and August 26"; and that Dr. Healey observed that T.E. had "talked about 'killing himself'"; and that he "displayed moments of extreme distress." The parents note that after a student inserted a pencil into T.E.'s anus, McCusker advised the parents that their perspective was "justified." The parents further note that when K.E. sought clarification with respect to Buono's inquiry why T.E. had not been classified if he had the safety needs that the parents requested, McCusker told them that the school "decided, without classification, to assign dedicate[d] supervision to [T.E.]. . . . [W]e did not have a medical diagnosis indicating a condition that would officially qualify him for a classification based on the need for physical protection." The parents also note that K.E. told Buono that "[s]ending [T.E.] to a private school is not our preference. But we trusted

the public school system this past year and each assurance which we trusted, resulted in the series of physical injuries listed above. As his parents, our primary responsibility is to ensure [T.E.'] safety and well-being." (*Id.*).

3. The ALJ determined that that K.E.'s testimony that "he was willing to lose the entire tuition if only NHRHS could assure him of T.E.'s safety" was not credible. (DE 24-1 ¶ 134).

   The parents allege that this is inconsistent with the non-testimonial extrinsic evidence. The parents note that on June 10 the they met with McCusker and a guidance counselor at Cavallini; that on June 15, B.E. emailed McCusker thanking him "for a reflective and productive meeting on Friday" and setting forth an "action plan"; and that several of the "action items" that McCusker agreed to undertake related to exploring potential private school placements for T.E. The parents further note that McCusker told them "if you/he can not confirm a set of actions to acknowledge that Highlands will be a safe and productive learning environment, the district/he will be an active partner with us to identify and secure another option." The parents further argue that the evidence reveals that their conduct did not change after they signed an enrollment contract with Dwight-Englewood and that they still continued to pursue placing T.E. at Northern Highlands.[15] (*Id.*).

4. The ALJ determined that B.E. "repeated her assertion that all she and her husband wanted was for T.E. to be safe and that NHRHS had not provided assurances for this" and her claim that "she wanted a 'top down' approach" was not credible. (DE 24-1 ¶ 135 & 136).

---

[15]    In particular, the parents identify the following items as evidence of their intent: the enrollment contract; the fact that B.E. attended an evaluation-planning meeting on July 20; an email exchange between B.E. and Northern Highlands confirming the financial arrangements for a neuropsychological evaluation; and two requests by K.E. for a personal meeting with Buono, both of which were rebuffed. (DE 24-1 ¶ 135).

The parents argue that this is inconsistent with the non-testimonial extrinsic evidence and note that B.E. told McCusker that "speaking to [the principal of Northern Highlands] will be important as having top down support is essential." (*Id.*).

## D. Federal Litigation

On August 9, 2018, T.E.'s parents appealed the ALJ's decision to this court. (DE 1). On August 14, 2018, they filed the currently operative amended complaint (DE 5). The parents seek (1) reversal of the ALJ's November 29 finding that they did not provide proper notice of T.E.'s unilateral placement; and (2) reversal of the June 27, 2018 final decision, which dismissed with prejudice the due process petition (DE 5). The amended complaint states five counts:

1. Reversal of November 29, 2017 Ruling That the Parents Failed To Give Notice in Accordance with N.J.A.C. § 6A:14-2.10(c)(2) and 20 U.S.C. § 1412(a)(10)(C)(iii)) (Count I)

2. Reversal of the ALJ's June 27, 2018 Final Order Dismissing Due Process Petition with Prejudice (Count II)

3. Violation of Section 504 from July 1, 2016 through October 31, 2016 (Count III)

4. Violation of IDEA from November 1, 2016 to the Present (Count IV)

5. Violation of Section 504 from November 1, 2016 to the Present (Count V)

(DE 5).

## II.  DISCUSSION AND ANALYSIS

### A. Standards of Review

#### 1. Summary Judgment under Rule 56

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and

inferences in light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### 2. Review of an ALJ's Decision

Additional special standards of review apply to an appeal like this one. Any party in a special education matter may appeal a decision of an ALJ by

filing a complaint with either a "state court of competent jurisdiction or in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A). The District Court receives the records of the administrative hearing but may hear additional evidence if it is requested by a party. *Id.* § 1415(i)(2)(C). An appeal to a federal court pursuant to § 1415 is decided by the court review of the records of the administrative proceedings and the district court "bas[es] its decision on a preponderance of evidence." *Id.*

"Under the IDEA, the reviewing court 'is obliged to conduct a modified *de novo* review, giving "due weight" to the underlying administrative proceedings.'" *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003) (quoting *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 530–31 (4th Cir. 2002)). "Factual findings from the administrative proceedings are to be considered *prima facie* correct." *Id.* (alteration omitted). However, district courts have discretion to determine how much deference to accord administrative proceedings. *Oberti v. Clementine Bd. of Educ.*, 995 F. 2d 1204, 1219 (3d Cir. 1993).

A court must consider the administrative findings of fact, but it is free to accept or reject them. *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir. 1995). If it chooses to depart from the findings of an administrative court, it must provide an explanation for its departure from that decision. *See Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4d Cir. 1991). "The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270

The United States Supreme Court has held that "due weight" is to be given to the decision of an administrative court in special education matters. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). And review of credibility-based factual findings of the ALJ who heard testimony below is limited. However, "[w]here . . . the findings . . . are not supported by the record, and indeed, the record supports contrary findings, we must reverse.'" *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 528 (3d Cir. 1995)

(quoting *Ali v. Gibson*, 631 F.2d 1126, 1129 (3d Cir. 1980)). Finally, a district court reviewing the administrative factual findings will defer to the ALJ's factual findings "unless it can point to contrary non-testimonial extrinsic evidence on the record." *S.H.*, 336 F.3d at 270.

Questions of law are nonetheless reviewed *de novo*. *See P.N. v. Greco*, 282 F. Supp. 2d 221, 235 (D.N.J. 2003).

### B. Substantive Law

#### 1. Individuals with Disabilities Education Act

The IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designated to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). States have an obligation to ensure that children with disabilities receive a "free appropriate public education, or "FAPE," *id.* § 1412(a)(1), in the form of special education "provided at public expense, under public supervision and direction," *id.* § 1401(8). That special education will be provided "in conformity with [an] individualized education program." *Id.*

A "child with a disability" is a "child [] with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness). . . other health impairments, or specific learning disabilities, and [] who, by reason thereof, needs special education and related services." *Id.* § 1401(3) (emphasis added).

The IDEA shields from financial responsibility school districts that offer a FAPE but are denied the opportunity to provide it:

> ([T]his part does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

*Id.* § 1412(a)(10)(C)(i). Parents may unilaterally place their children into private school at public expense if the local school district has not properly provided a FAPE:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

*Id.* 1412(a)(10)(C)(ii). In some instances, even a school that has not (or has not yet) provided a FAPE may nonetheless escape liability for reimbursement of tuition costs, if the parents' failure to conform to certain procedural requirements contributed to that situation:

> The cost of reimbursement described in clause (ii) may be reduced or denied [if]
>
> > . . . at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense;
> >
> > . . . 10 business days . . . prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the [rejection of the placement proposed by the school;
> >
> > . . . . prior to the parents' removal of the child from the public school, the public agency informed the parents . . . .of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

> . . . upon a judicial finding of unreasonableness with respect
> to actions taken by the parents.

*Id.* at 1412(a)(10)(C)(iii).

New Jersey has also promulgated regulations that limit the
reimbursement obligations of school districts that adequately accommodate
special-needs students:

> [T]he district board of education shall not be required to pay for the
> cost of education, including special education and related services,
> of a student with a disability if the district made available a free,
> appropriate public education and the parents elected to enroll the
> student in a nonpublic school, an early childhood program, or an
> approved private school for students with disabilities.

N.J.A.C. § 6A:14-2.10(a). However, a parent may take unilateral—and
reimbursable—placement action if the school district fails to meet its
requirements:

> If the parents of a student with a disability, who previously
> received special education and related services from the district of
> residence, enroll the student in a nonpublic school, an early
> childhood program, or approved private school for students with
> disabilities without the consent of or referral by the district board
> of education, an administrative law judge may require the district
> to reimburse the parents for the cost of that enrollment *if the
> administrative law judge finds that the district had not made a free,
> appropriate public education available to that student in a timely
> manner prior to that enrollment and that the private placement is
> appropriate*. A parental placement may be found to be appropriate
> by a court of competent jurisdiction or an administrative law judge
> according to N.J.A.C. 6A:14-6.5 for placements in unapproved
> schools, even if it does not meet the standards that apply to the
> education provided by the district board of education.

*Id.* § 6A:14-2.10(b) (emphasis added). However, the law still imposes procedural
requirements upon parents who rightly make unilateral placements:

> The parents must provide notice to the district board of education
> of their concerns and their intent to enroll their child in a
> nonpublic school at public expense. The cost of reimbursement . . .
> may be reduced or denied:

1. If at the most recent IEP meeting that the parents attended prior to the removal of the student from the public school, the parents did not inform the IEP team that they were rejecting the IEP proposed by the district;

2. At least 10 business days (including any holidays that occur on a business day) prior to the removal of the student from the public school, the parents did not give written notice to the district board of education of their concerns or intent to enroll their child in a nonpublic school;

3. If prior to the parents' removal of the student from the public school, the district proposed a reevaluation of the student and provided notice according to N.J.A.C. 6A:14-2.3(g) and (h) but the parents did not make the student available for such evaluation; or

4. Upon a judicial finding of unreasonableness with respect to actions taken by the parents.

*Id.* § 6A:14-2.10(c).

The parents now argue for the inapplicability of 20 U.S.C. § 1412(a)(10)(C)(iii)—the provision of the IDEA that limits a district's reimbursement obligations if procedural deficiencies have occurred—and New Jersey's analogous provision, N.J.A.C. § 6A:14-2.10(c)(2). They do not apply, say the parents, because T.E. did not receive special-education and related services *prior to* being unilaterally placed at Dwight-Englewood. They also argue that the ALJ erred in dismissing their due process petition for three reasons: (1) the ALJ deprived them of the procedural protections of § 504 and the IDEA; (2) the equities favor their position over that of Northern Highlands; (3) the ALJ's determinations that K.E. and B.E. were not credible is not supported by extrinsic, non-testimonial evidence.

T.E.'s parents also argue that Northern Highlands deprived T.E. of a FAPE by: (1) failing to take appropriate action to ensure that T.E. would not be bullied if he had attended Northern Highlands; and (2) proposing an IEP that was substantively inadequate because it did not address T.E.'s individualized educational needs.

### (a) Applicability of the Liability-limiting Provisions

Here it is undisputed that the parents did not—as is required by 20 U.S.C. § 1412(a)(10)(C)(iii)[16]—notify the district in advance of their intent to unilaterally place T.E. at Dwight-Englewood. The parents point to a provision in the IDEA that empowers a court or hearing office to disallow reimbursement "[i]f the parents of a child with a disability, *who previously received special education and related services under the authority of a public agency*" unilaterally place a student in a private institution. *Id.* § 1412(a)(10)(C)(ii).[17] T.E.'s parents insist that this provision does not apply because T.E. had not previously received special education from Northern Highlands, and that they were therefore entitled to unilaterally place him without prior notice. The parents may be correct that this provision does not apply to them,[18] but this is not the only relevant provision. Immediately preceding that provision is the following subsection, which states the blanket rule: The regulation "does not require a local educational agency to pay for the cost of education. . . *if that agency made a free appropriate public education available to the child.*"[19] 20

---

[16]     N.J.A.C. § 6A:14-2.10(c) is substantially identical.

[17]     N.J.A.C. § 6A:14-2.10(b) is substantially identical.

[18]     20 U.S.C. § 1412(a)(10)(C)(ii) presumably applies in situations where a school district's once-satisfactory special-education services fall below the free-and-appropriate standard. Under the rule, parents may, in those cases, unilaterally place their children into private school, but reimbursement is still conditional on an administrative finding that the school district did not offer a FAPE and that the placement is appropriate. *See id.* That is not the case here, because the ALJ did not determine to that Northern Highlands had failed to provide T.E. a FAPE. Indeed, the district was not provided the opportunity to do so.

[19]     In fact, the parents' characterization misstates the law. The statute provides that (emphasizing the omission in the parents' argument):

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents *for the cost of that enrollment if the court or hearing officer finds that the agency*

U.S.C. § 1412(a)(10)(C)(i) (emphasis added).[20] That provision [(C)(i)], and not the provision cited by the parents [(C)(ii)], is the basis for the district's argument. To view (C)(ii) in isolation while ignoring (C)(i) would scramble the statutory scheme of special-education reimbursement. The parents do not cite any case law to support their position that the federal and state regulations do not apply to them. Accordingly, I find that the notice requirements contained in 20 U.S.C. § 1412(a)(10)(C) and N.J.A.C. § 6A:14-2.10(c) apply to the parents.

### (b) The Reasonableness of the Parents' Conduct

IDEA and state law both provide more generally for non-reimbursement in the event that the factfinder determines that parents conducted themselves unreasonably in making a unilateral placement decision. *See* 20 U.S.C. § 1412(a)(10)(C)(iii); N.J.A.C. § 6A:14-2.10(c). Put another way, the parents are free to place their child in any school they wish, but to obtain reimbursement from their local school district, they must have behaved reasonably in relation to the fashioning of a FAPE. *See* 20 U.S.C. § 1412(a)(10)(C)(iii); N.J.A.C. § 6A:14-2.10(c). T.E.'s parents concededly did not provide ten days' written notice prior to placing T.E. at Dwight-Englewood, an initial hurdle to their claim to have behaved reasonably. Still, I will review the record to determine whether T.E.'s parents acted reasonably overall in their dealings with the district, as those dealings bear on their placement decision.

In their submissions to this Court, the district has identified numerous federal and state decisions that denied reimbursement where: (1) the parents did not provide ten days' prior notice of unilateral placement of the child in a private facility; and/or (2) had not acted reasonably in connection with unilateral placement. *See Fisher v. Stafford Twp. Bd. of Educ.*, 2007 U.S. Dist. LEXIS 14003 (D.N.J. 2007) (affirming ALJ's dismissal of parent's request for

---

*had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.*

20 U.S.C. § 1412(a)(10)(C)(i).

[20]     N.J.A.C. § 6A:14-2.10(a) is substantially identical.

reimbursement because the parent failed to notify the district's board of education of her concerns and intent to enroll her child in a nonpublic school at public expense); *A.Z. v. Mahwah Twp. Bd. of Educ.*, 2006 U.S. Dist. LEXIS 22305 (D.N.J. 2006) (affirming ALJ ruling that denied mother's request for reimbursement due to procedural inadequacies); *R.G. o/b/o E.G. v. Glen Ridge Bd. of Educ.*, 2005 N.J. Admin. No. EDS 3714-04 & 1435-05 ("independent of the issue of the 20 month delay in filing her due process petition, [petitioner] failed to provide acceptable notice to the District of her concerns and intent . . . thereby unreasonably preventing the district from having any meaningful opportunity to participate in a collaborative discussion as intended by the IDEA"); *M.S. o/b/o J.S. v. Princeton Reg'l Bd. of Educ.*, N.J. Admin. No. EDS 402-05 ("[The IDEA] provides that where a child has not previously received special education and related services from a public agency, there is no authority to reimburse the tuition expenses arising from the parent's unilateral placement of the child in private school."); *see also M.I. o/b/o M.I. v. N. Hunterdon/Voorhees Reg'l High Bd. of Educ.*, N.J. Admin. No. EDS 15963-16; *H.L. and J.L. o/b/o V.L. v. Marlboro Twp. Bd. of Educ.*, N.J. Admin. No. EDS 8677-16; *A.L. and R.L. o/b/o K.L. v. Englewood Bd. of Educ.*, N.J. Admin. No. EDS 10942-15; *W.D. o/b/o W.D. v. Watchung Hills Reg'l Bd. of Educ.*, N.J. Admin. No. EDS 15092-12; *K.S. and M.S. o/b/o Summit City Bd. of Educ.*, N.J. Admin. No. EDS 9012-12; *D.A. and A.A. o/b/o R.A. v. Haworth Bd. of Educ.*, N.J. Admin. No. EDS 12450-07; *T.W. and E.W. o/b/o T.W. v. N. Plainfield Bd. of Educ.*, N.J. Admin. No. EDS 8699-03 & 392-04; *Jos. B. o/b/o J.B. v. Rancocas Valley Reg'l High School Bd. of Educ.*, N.J. Admin. No. EDS 2472-03. The parents, on the other hand, have not cited any case law on point to establish that (1) their procedural deficiencies are excusable; or (2) their conduct was reasonable.

Here, T.E.'s parents signed and agreed to a 504 Plan for T.E. on June 12, 2016. Earlier, while T.E. was at Cavallini, his parents had refused the efforts of that middle school district (Upper Saddle River) to classify him. After the

bullying incidents at Cavallini, on July 15, 2016, T.E.'s parents paid the Dwight-Englewood tuition in full for the following year. At the time, it is true, Northern Highlands had not completed an initial eligibility and IEP meeting for T.E. for the upcoming school year. That delay, however, was largely if not solely attributable to the time required for the *parents*' expert to complete her evaluation and report. During that time, the parents neither formally challenged the June 12 504 Plan nor indicated in writing that they intended to reject it. The Northern Highlands district agreed to implement B.E.'s handwritten comments to the 504 Plan. They were prevented from doing so, however, by the parents' refusal to enroll T.E. at Northern Highlands. Even after enrolling T.E. at Dwight-Englewood, T.E.'s parents did not actually object to the IEP that Northern Highlands had proposed for T.E. Instead, they waited until the October 2016 meeting to reject the IEP in its entirety, informing the district's CST that they did not intend to withdraw T.E. from Dwight-Englewood. Moreover, K.E. and B.E. did not notify Northern Highlands in writing of their unilateral placement decision until November 2016—two months after T.E. had started school at Dwight-Englewood and a month after the IEP meeting had taken place.

T.E.'s parents now seek relief despite failing to contest the plan to which they agreed before the end of the prior school year. Their expert did not complete her report over the summer, postponing the district's ability to prepare a final IEP. And once the new school year began, the parents became intractable, refusing to allow Northern Highlands to implement its plan— instead placing T.E. at Dwight-Englewood—and, at the October meeting, categorically refusing to place T.E. at Northern Highlands. In short, the evidence demonstrates that, after early July, K.E. and B.E. never truly intended to place T.E. at Northern Highlands. The ongoing discussions with the district masked a *fait accompli*.[21]

---

[21]    There was evidence that the parents chose to send T.E.'s older brother, who does not have any special education needs, to Dwight-Englewood as well. It does not

The record supports the ALJ's determination that T.E.'s parents were not entitled to challenge the district's proposed IEP because they unilaterally placed T.E. at Dwight-Englewood without providing the district ten days' notice of the placement. The record also supports the ALJ's ruling that the parents' conduct throughout the summer and fall was not sufficiently reasonable as to excuse their procedural deficiencies.

### (c) Credibility Determinations

T.E.'s parents attack the credibility determinations of the ALJ. He found neither K.E. nor B.E. credible:

> I had a great deal of difficulty with K.E.'s testimony. He was argumentative. He was evasive. He was condescending. He would often argue with District counsel over the type of questions asked. I would advise K.E. he was to answer the question posed if there was no objection from his attorney. He would not answer yes or no questions directly. He spun his answers to conform to his theme, which was NHRHS did not offer sufficient assurances that T.E. would be safe. He signed a contract with Dwight-Englewood on July 15, 2016, but repeatedly said he was willing to lose the entire tuition if only NHRHS could assure him of T.E.'s safety. He was evasive in responses to simple questions. He stated in response to a question as to why his younger son also attended Dwight-Englewood, a son who has no special education or 504 accommodation needs, that the number one reason was for him to keep an eye on T.E. This response defies credulity as his younger son is not in the same classes and sees T.E. at lunch. He also stated that NHRHS refused to pay Dr. Healy. This is false. NHRHS agreed to pay Dr. Healy up to the amount that was permitted. While I do believe the incidents related to T.E. occurred at USR, I cannot deem K.E. a credible witness. I thought him disingenuous in much of his testimony.

> The testimony of B.E. was also problematic. She was also argumentative and evasive while being cross-examined. She repeated her assertion that all she and her husband wanted was

---

appear that the ALJ placed great weight on this fact, which establishes at most that the parents perhaps had a generalized preference independent of T.E.'s particular needs.

for T.E. to be safe and that NHRHS had not provided assurances for this. She also stated several times she wanted a "top down" approach. She seemed concerned that the NHRHS principal did not attend the 504 meeting or the IEP meeting. While I do not believe B.E. was being purposely untruthful, I do believe she was only willing to provide answers that adhered to her version of what transpired. She was unwilling, or unable, to answer a simple yes or no question directly. Her answers always required additional responses to such yes or no questions. I cannot deem her credible.

(DE 23-8 at 13–14).

I have reviewed the relevant transcripts. The ALJ's comments do not appear unreasonable in light of what I have read. Without the benefit of observing the witnesses' demeanor, I can go no further, and I defer to the ALJ's assessment.

To speak plainly, the ALJ did not believe the parents' narrative that they sought to place T.E. in Northern Highlands and, but for the district's misfeasance, would have done so. The parents cites as corroboration their communications during the summer with the Northern Highlands staff. These include K.E.'s email to Buono, noting that that "[s]ending [T.E.] to a private school is not our preference" and his communication with McCusker that "[i]t has been and remains our expectation that [T.E.] matriculate to Northern Highlands in September."

The record suggests otherwise, however; it is consistent with the ALJ's conclusion that the parents had already made their decision. By the time the parents satisfied the ten-day notice requirement—in November—T.E. had been at Dwight-Englewood for over two months, and tuition had been paid two months before that. At the October IEP meeting, T.E.'s parents informed the CST that they did not intend to place T.E. at Northern Highlands—even before they read the IEP. Moreover, although T.E.'s parents now claim that they did not agree to the June 12 504 Plan, B.E. in fact signed it.

The ALJ was also entitled to consider the timing of Dr. Healey's report, although the parents minimize its importance. The parents engaged Dr. Healey

in July 2016, but her neuropsychological report was not released until October. T.E.'s parents repeatedly characterize Buono's failure to meet with them in August as a sign of the district's bad faith, but the IEP was contingent on that expert report, the completion of which still lay months in the future.

The parents, even if they did not actually receive a PRISE booklet in 2016, are not credible in claiming that they were not aware of their right to request reimbursement for a private school placement. T.E. had had an IEP since fifth grade, and school districts are required to provide PRISE booklets once a year. The parents' contention is further weakened by their continued discussions with Northern Highlands, even after the payment of the full year's tuition at Dwight-Englewood. If the parents had not known of their possible right to be reimbursed, these continued discussions would not have made sense; the $42,000 for tuition had been spent.

The ALJ had a substantial basis in the evidence for concluding that the parents were aware of their reimbursement rights; that they had made up their mind to place T.E. in private school; and that they continued discussions with the district solely in order to better position themselves for reimbursement. In short, the record supports the ALJ's determination that the parents were not truthful in claiming that they had had an "open mind" about forfeiting the $42,000 tuition payment, removing T.E. from Dwight-Englewood, and sending him to Northern Highlands.

I do not suggest that the ALJ's conclusion was the only possible one, but it was a permissible one, and it has good record support. Credibility findings "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." *State v. Locurto*, 157 N.J. 463 (1999). A fact finder is expected to base decisions of credibility on his or her common sense, intuition or experience. *Barnes v. United States*, 412 U.S. 837 (1973). The ALJ hearing the parents' case was in a stronger position than this Court to make those character and demeanor determinations. The evidence before this Court does not warrant overturning the ALJ's determination that K.E. and B.E. were

not credible about their willingness to remove T.E. from Dwight-Englewood and place him at Northern Highlands.

### 2. Section 504

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination by reason of disability in the funding of federal grants and programs. *See* 29 U.S.C. § 794. It provides that

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . .

(*Id.*).

T.E.'s parents now argue that the plan proposed by Northern Highlands violated § 504 because (1) the plan would have required T.E. to leave each class five minutes early; and (2) Northern Highlands failed to take appropriate action to protect T.E. from future bullying had he begun attending in September. The district argues that the ALJ properly dismissed the parents' § 504 claim.

### (a) The Proposed Plan

The administrative record leaves little doubt that the parents accepted the district's 504 Plan and that, in any event, the plan did not discriminate against T.E.

To begin, the 504 Plan as signed by B.E. did not call for him to leave class early; that suggestion was proposed weeks later and was never memorialized by either side. That issue was not before the ALJ and is not here now. Moreover, T.E.'s parents have in large part rested their case on the comments B.E. inserted into the 504 Plan that she signed in June, but those suggestions were either vague, conditioned upon T.E.'s presence at school, or both. B.E.'s comment to the 504 Plan read:

> 12. pair him with patient and nurturing teachers who will encourage him to go to extra help, give extra credit and maybe not so heavy with homework

13. assign him some classes and lunch with some friends

14. have the noncontact sports teachers[—]gold, tennis[—]reach out to him

15 meet with his teaches before the school year starts as well as monthly + discuss updates and progress concerns

16. specific attention and consideration to which guidance counselor he will be assigned to and an early introduction to that person

(DE 23-21 at 2–3).

Clearly, implementation of these suggestions would depend on T.E.'s presence at Northern Highlands. T.E.'s parents frustrated any such effort by placing him at Dwight-Englewood. Moreover, LaRocca testified that the district would adjust T.E.'s schedule to keep him with friends and away from his aggressors. Taken together, the evidence shows that the parents signed a proposed 504 Plan that did not discriminate against T.E.

### (b) The Failure to Protect T.E.

The record does not reflect that Northern Highlands' alleged failure to assure the parents that it would keep T.E. safe was the but-for cause of his placement at Dwight-Englewood. There is no doubt that K.E. and B.E. were deeply concerned for T.E.'s safety, but the record demonstrates that the parents had made up their minds to send T.E. to private school before they provided Northern Highlands a sufficient opportunity to assuage their fears. Both sides note that the parents' other son—T.E.'s brother—now also attends Dwight-Englewood, giving T.E. "peace of mind." However, the parents have conceded that T.E.'s brother was not in a position to protect T.E. at Dwight-Englewood.

T.E.'s parents allege that Dwight-Englewood reassured them that T.E. would be safe but that Northern Highlands did not provide such assurances. However, they have presented no evidence that shows how Dwight-Englewood satisfied their safety concerns in a way that the district did not. During the hearing, B.E. admitted that they had never asked Northern Highlands about

physical confrontations. Moreover, neither parent asked Northern Highlands about student safety; both, however, repeatedly emphasized that they had obtained assurances from Dwight-Englewood on that topic.

In fact, Dwight-Englewood is a private college preparatory school that does not offer special education or section 504 services to its students. At Dwight-Englewood, T.E. does not have an aide. However, they now claim that the absence of aide at Northern Highlands (which they did not specifically request in any event) was key in their decision to select Dwight-Englewood.

The most problematic fact for the parents' argument, however, remains their July 15, 2016 contract with Dwight-Englewood, which required a non-refundable $42,000.00 tuition payment. That contract represents strong evidence that as of July, T.E.'s parents no longer intended to send him to Northern Highlands. Their evidence to the contrary consists of their own testimony and their own late-summer emails suggesting that they were still open to public-school placement. The ALJ permissibly concluded, in the context of the other evidence, that these were conscious, *post hoc* efforts to create a record, not sincere statements of intent. The ALJ's conclusion that the parents had already made their decision finds additional support in the sheer absence of any suggestions, proposals, or criticisms by the parents of the June 12 504 Plan or the October 13 IEP that Northern Highlands proposed for T.E.

In sum, the parents have not put forth sufficient evidence to overcome the ALJ's determination that Northern Highlands did not violate T.E.'s rights under § 504.

### III. CONCLUSION

Toward the end of his time at the Cavallini Middle School, T.E. underwent physical bullying that would break the heart of any parent. No one could fault his parents' highly personal decision that, going forward, T.E. would better thrive in a private high school. They unilaterally placed him in Dwight-Englewood and sought reimbursement of his tuition payments from the district. To obtain such reimbursement, however, federal and state law required them to reasonably afford Northern Highlands—a school district in

which T.E. had not been bullied—the opportunity to demonstrate that it could provide T.E. with a free and appropriate public education. The ALJ determined that both the 504 Plan and the IEP provided T.E. with a FAPE, and that the parents neither complied with notice requirements nor behaved reasonably in connection with the process before unilaterally placing their child at Dwight-Englewood. The record now before the Court supports that conclusion.

Accordingly, Plaintiffs' Motion for Summary Judgment and Partial Summary Judgment is **DENIED,** and Defendant's Motion for Summary Judgment is **GRANTED**. An appropriate order follows.

Dated: October 30, 2019

**Hon. Kevin McNulty**
**United States District Judge**